KATHLEEN A. MORIN, administratrix,[1] *vs.* AUTOZONE
NORTHEAST, INC., & others.[2]

No. 09-P-1816.

Middlesex. September 20, 2010. - March 14, 2011.

Present: DUFFLY, SIKORA, & MILKEY, JJ.[3]

*Asbestos. Negligence,* Causation, Duty to warn.

Discussion of the standard of review applicable to the allowance of a motion
for summary judgment. [42]

Discussion of the standard for proving causation in an asbestos case. [42-43]

In a wrongful death action alleging that the plaintiff's decedent had contracted
mesothelioma from inhaling asbestos fibers at her place of work from
automobile parts which the defendants manufactured or sold, and claiming
that each of the defendants was liable for breach of express and implied
warranties of merchantability and for common-law negligence, the judge
erred in granting summary judgment in favor of two defendants, where the
evidence would permit a finding that the company for which the decedent
worked purchased asbestos-containing brake and clutch parts from those
defendants; that she was in close proximity to asbestos-containing parts from
those defendants on numerous occasions and was exposed to asbestos fibers
from those parts which spread into her office from the mechanics' use of an
air hose to blow out dust as they performed brake and clutch jobs; and that
the exposure to those defendants' parts substantially contributed to the causa-
tion of mesothelioma. [45-49]

In a wrongful death action alleging that the plaintiff's decedent had contracted
mesothelioma from inhaling asbestos fibers at her place of work from auto-
mobile parts which the defendants manufactured or sold, and claiming that
each of the defendants was liable for breach of express and implied warran-
ties of merchantability and for common-law negligence, the judge properly
granted summary judgment in favor of one defendant, where the plaintiff
could not establish the essential element of product identification, in that the
plaintiff had no reasonable expectation of proving that a trailer manufactured
by the defendant and purchased secondhand by the decedent's employer

---

[1]Of the estate of Geraldina M. Medeiros.

[2]Orleans Auto Supply, Inc., and Great Dane Limited Partnership. Prior to
January 1, 1997, the latter entity was known as Great Dane Trailers, Inc. Sub-
sequently, it became known as CRA Trailers, Inc. We shall refer to this
defendant as "Great Dane."

[3]Justice Duffly participated in the deliberation on this case while an Associ-
ate Justice of this court, prior to her appointment as an Associate Justice of
the Supreme Judicial Court.

contained asbestos-bearing brakes manufactured by the defendant either at the time of the decedent's employer's purchase or throughout the period of the employer's maintenance [49-51]; and where the evidence was insufficient to create a triable question whether the decedent experienced more than insignificant or de minimis exposure to the defendant's asbestos product [51-53].


CIVIL ACTION commenced in the Superior Court Department on December 29, 2005.

The case was heard by *Charles J. Hely*, J., on motions for summary judgment.

*Shaun B. Spencer* for the plaintiff.

*Robert L. Boston* for AutoZone Northeast, Inc.

*Andre A. Sansoucy* for Orleans Auto Supply, Inc.

*Susan E. Stenger* for CRA Trailers, Inc.

SIKORA, J. Geraldina Medeiros (Geraldina)[4] and her husband, Anthony Medeiros (Anthony), owned and operated Bedford Fruit Company (Bedford Fruit or Company), a fresh produce supplier located in Hyannis. They acquired Bedford Fruit in 1952 and ran the company until it ceased business in 1991. They took an active role in day-to-day operations throughout their proprietorship. In May of 2005, almost fifteen years after Bedford Fruit had closed its doors, Geraldina died as a result of malignant mesothelioma.[5]

The plaintiff in this case, Kathleen Morin, is the daughter of Geraldina and the administratrix of her estate. In December, 2005, Morin began a wrongful death action on behalf of the estate. She named forty defendants, mainly automobile parts manufacturers and retailers.[6] Morin alleged that her mother contracted mesothelioma because she had inhaled asbestos fibers

---

[4]For the sake of clarity, we use the first names of members of the Medeiros family.

[5]Mesothelioma consists of a tumor or layer of abnormal tissue deriving from cells lining the pleura ("membrane enveloping the lungs and lining the walls of the pulmonary cavities") or the peritoneum (the sac lining the abdominopelvic cavity). It is composed of spindle cells or fibrous tissue and grows as a thick sheet covering the viscera. Stedman's Medical Dictionary 1192, 1465, 1512 (28th ed. 2006). Geraldina died from diffuse malignant mesothelioma.

The plaintiff's medical expert furnished a detailed opinion that in Geraldina's circumstances "the only established cause" of her disease would have been inhalation of asbestos released from work on brakes and clutches of vehicles at Bedford Fruit.

[6]The original defendants were A.F. German Co., Inc.; American Optical

as she worked at Bedford Fruit. She asserted that the asbestos fibers came from automobile parts which the defendants manufactured or sold, and claimed that each of the defendants was liable for breach of express and implied warranties of merchantability and for common-law negligence.[7] Some of the defendants promptly settled with Morin, and some moved for summary judgment.

In an order dated November 3, 2008, a judge of the Superior Court allowed the summary judgment motions of twelve defendants and denied the summary judgment motions of three defendants.[8] The volume of the parties' issues and arguments below made individualized reasoning prohibitive. However, the parties' arguments on appeal show us that the ground for allowance of each motion for summary judgment was the insufficiency of evidence of causation.

Corporation; Ashley Ford Sales, Inc.; AutoZone Northeast, Inc.; A.W. Chesterton Company; Big A Auto Parts, Inc.; Bondex International, Inc.; BorgWarner Morse TEC, Inc.; Broadway Brake Supply, Inc.; Colony Ford Truck Center, Inc.; DaimlerChrysler Corporation; Ford Motor Company; Freightliner LLC; General Electric Company; General Motors Corporation; Genuine Parts Co.; Georgia-Pacific LLC; Great Dane Limited Partnership; Honeywell International Inc.; International Truck and Engine Corporation; Mack Trucks, Inc.; Metropolitan Life Insurance Company; National Automotive Parts Association; Orleans Auto Supply, Inc.; Paul E. Dutelle and Co., Inc.; Philips Electronics North America Corporation; Pioneer Heavy Duty Parts, Inc.; Pneumo Abex Corporation; Rodman Ford Sales, Inc.; Ron's Truck Stop, Inc.; RPM, Inc.; Saab Cars USA, Inc.; Strick Corporation; T H Agriculture & Nutrition, LLC; Toyota Motor Sales, U.S.A., Inc.; Union Carbide Corporation; Uniroyal, Inc.; United Gilsonite Laboratories; Viacom Inc.; and Waldo Bros. Company.

[7]See, e.g., *Back* v. *Wickes Corp.*, 375 Mass. 633, 640-641 (1978); *Haglund* v. *Philip Morris, Inc.*, 446 Mass. 741, 745-748 (2006), for elaboration of the applicability of the implied warranty of merchantability to both the manufacturer and subsequent seller of a product "defective and unreasonably dangerous" for its ordinary purpose.

[8]The Superior Court judge granted summary judgment to AutoZone Northeast, Inc.; Ashley Ford Sales, Inc.; Colony Ford Truck Center, Inc.; Great Dane; Chrysler LLC and Daimler Trucks North America LLC (identified in the complaint as DaimlerChrysler Corporation); Navistar, Inc. (identified in the complaint as International Truck and Engine Corporation); Orleans Auto Supply, Inc.; Pioneer Heavy Duty Parts, Inc.; Pneumo Abex LLC (identified in the complaint as Pneumo Abex Corporation); Ron's Truck Stop; and Toyota Motor Sales, U.S.A., Inc. The judge denied summary judgment as to Ford Motor Company, General Motors Corporation, and Honeywell International, Inc. The plaintiff subsequently settled with the latter three defendants, and a final judgment dismissing all claims entered on February 18, 2009.

After settling with the remaining defendants, Morin appealed from the grant of summary judgment to three defendants: Auto-Zone Northeast, Inc. (AutoZone); Great Dane Trailers, Inc. (Great Dane); and Orleans Auto Supply, Inc. (Orleans). On appeal, Morin argues that she presented evidence from which a jury could find that asbestos fibers from those defendants' products contributed to the cause of Geraldina's death. As to the claims against AutoZone and Orleans, we agree with Morin and there-fore reverse so much of the judgment as dismisses the claims against those defendants. As to Great Dane, we conclude that the judge properly allowed its motion for summary judgment.

*Discussion.* 1. *Standard of review.* This court reviews de novo the allowance of a motion for summary judgment. *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007). The critical question is whether the moving party has established that an opposing party bearing the burden of proof at trial "has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). For this determination, we inspect the evidence in the light most favor-able to the nonmoving party. *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). We do not consider "the credibility of witnesses or the weight of the evidence." *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370, cert. denied, 459 U.S. 970 (1982). However, the nonmoving party cannot defeat the motion for sum-mary judgment by "rest[ing] on [its] pleadings and mere asser-tions of disputed facts." *LaLonde* v. *Eissner*, 405 Mass. 207, 209 (1989).

2. *Causation in asbestos claims.* To prove causation in an asbestos case, the plaintiff must establish (1) that the defend-ant's product contained asbestos (product identification), (2) that the victim was exposed to the asbestos in the defendant's product (exposure), and (3) that such exposure was a substantial contribut-ing factor in causing harm to the victim (substantial factor). *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. 157, 161-162 (1991). As noted above, summary judgment is appropriate only if the plaintiff has "no reasonable expectation" of proving one of these elements. *Kourouvacilis* v. *General Motors Corp.*, *supra* at 716.

Several characteristics of the generation of disease and death by asbestos inhalation have moved courts to adapt the standard

of proof of causation. Those characteristics are the prolonged latency of the induced disease,[9] the multiple points of exposure of the victim, and the indistinguishability of contributory exposures. Because the resulting injury may not emerge for years or decades after exposure, the law does not require the plaintiff or his or her witnesses to establish the precise brand names of the asbestos-bearing products, the particular occasions of exposure, or the specific allocation of causation among multiple defendants' products. Evidence will be sufficient to reach the fact finder if it permits the reasonable inference of the presence at a work site of both the plaintiff and the defendant's asbestos-containing product for an appreciable period of exposure. See *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. at 162-163; *Roehling* v. *National Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228 (4th Cir. 1986); *In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806, 817-818 (9th Cir. 1992); *Kreppein* v. *Celotex Corp.*, 969 F.2d 1424, 1425-1426 (2d Cir. 1992).

To raise a triable issue of a sufficient exposure and of a substantial contributing role, the plaintiff need not produce evidence of "but for" causation on the part of the targeted product, but only of its contribution to causation of the resulting injury. See *Welch* v. *Keene Corp.*, *supra* at 162, citing *O'Connor* v. *Raymark Indus., Inc.*, 401 Mass. 586, 589 (1988); *Payton* v. *Abbot Labs*, 780 F.2d 147, 156 (1st Cir. 1985); and Restatement (Second) of Torts § 433B(1) comment a (1965). However, the adjusted standard of proof of causation does not relax to a level of speculation. The plaintiff must produce evidence of a degree of exposure greater than "insignificant or de minimis." *Welch* v. *Keene Corp.*, *supra.*

With this analytical framework in mind, we examine the evidence against each defendant and consider whether Morin presented sufficient evidence of the necessary elements. If evidence of any element is deficient, summary judgment would be appropriate.

At the outset we note that one of Morin's expert medical witnesses, a well qualified pathologist, furnished the opinion that

---

[9]See Churg & Green, Pathology of Occupational Lung Disease 350 (2d ed. 1998) ("The latency period for asbestosis-induced mesothelioma is long, with a mean value of 30 to 40 years").

"each and every exposure to asbestos that [Geraldina] received as a bystander to the Bedford Fruit mechanics' work with asbestos-containing vehicles . . . was a substantial contributing factor in causing [her to contract] malignant mesothelioma." This testimony is critical because it explains the causal link between exposure to asbestos and contraction of the disease. See *Welch* v. *Keene Corp., supra* at 162 (jury could infer that plaintiff's exposure was substantial factor because plaintiff offered expert testimony explaining that plaintiff's disease "was caused by the cumulative effect of all the [asbestos] dust that he had inhaled over the span of his career"). See also *Sheffield* v. *Owens-Corning Fiberglass Corp.*, 595 So. 2d 443, 456 (Ala. 1992) (evidence sufficient to show causation where plaintiff worked in close proximity to defendant's asbestos products and expert testified that "each and every exposure to asbestos contributes in a causally significant and substantial manner to asbestos-related lung impairment"); *Jones* v. *John Crane, Inc.*, 132 Cal. App. 4th 990, 999 (2005) (substantial factor evidence sufficient because expert witness asserted that each and every exposure to defendant's asbestos products was a substantial factor toward plaintiff's contraction of lung cancer); *Purcell* v. *Asbestos Corp. Ltd.*, 153 Or. App. 415, 421 (1998) (evidence sufficient to show causation where plaintiff's expert testified that a single exposure to asbestos fibers can cause mesothelioma and concluded that "all of plaintiff's exposure to asbestos fibers over the years 'contributed to some degree' to his mesothelioma").

The main body of percipient evidence in this case comes from the deposition testimony of Michael Medeiros (Michael) and John Brillante. Michael is Geraldina's son. He worked part time at Bedford Fruit throughout his adolescence, from the late 1970s until his graduation from high school in 1984. He worked elsewhere for a year, then returned to Bedford Fruit in 1985, and worked there full time until its closure in 1991. His many different responsibilities included mechanical work.

John Brillante was Bedford Fruit's in-house mechanic for a four- to five-year period in the mid-1980s. His primary responsibility was maintenance of Bedford Fruit's vehicles. He had charge of ordering replacement auto parts for the company fleet. In addition to the testimony from Michael and Brillante,

the summary judgment record includes deposition testimony from representatives of Great Dane, AutoZone, Orleans, and medical experts.

3. *Plaintiff's case against AutoZone.* Morin asserts that Bedford Fruit personnel purchased asbestos-containing brake and clutch parts from American Discount Auto Parts (ADAP), a company acquired by AutoZone in 1998. She claims that Geraldina was exposed to asbestos fibers emanating from the parts at the Bedford Fruit building.

a. *Product identification.* ADAP opened a store in Hyannis in the late 1970s. It was the closest automobile parts store to Bedford Fruit. Company personnel went to the ADAP store to purchase after-market parts for its medium- and light-duty vehicles. Michael Medeiros purchased replacement brake and clutch parts from ADAP, and saw the word "asbestos" on the packaging. AutoZone's representative admitted that the ADAP store in Hyannis carried asbestos-containing brake and clutch parts during the 1970s and for at least a time in the 1980s.

This evidence would permit a finding that Bedford Fruit purchased asbestos-containing brake and clutch parts from ADAP. No question arises whether Bedford Fruit purchased parts from ADAP. The question is whether the parts contained asbestos. Michael's assertion that he saw the word "asbestos" on the packaging of brake and clutch parts purchased from ADAP furnishes strong evidence that these parts contained asbestos. See *Turnbaugh* v. *GAF Corp.*, 765 F. Supp. 1537, 1540 (W.D. Pa. 1991) (summary judgment denied where coworker of plaintiff testified that he saw the word "asbestos" on defendant's product); *Cain* v. *Green Tweed & Co.*, 832 A.2d 737, 741-742 (Del. 2003) (product identification sufficient where employee testified that he knew manufacturer's product contained "Palmetto" asbestos because packaging of product was labeled "Palmetto"). See also *Gifford* v. *National Gypsum Co.*, 753 F.2d 1345, 1348-1349 (5th Cir. 1985) (testimony of decedent that manufacturer's "Gold Bond" label appeared on asbestos products sufficient to establish that manufacturer made products); *Herber* v. *Johns-Manville Corp.*, 785 F.2d 79, 87 (3d Cir. 1986) (jury entitled to infer that asbestos products came from defendant manufacturer where plaintiff testified that he saw defendant's name and corporate logo on product).

AutoZone's admission that the ADAP store in Hyannis carried asbestos-containing brake and clutch parts until some time in the 1980s is similarly persuasive. See *Ecklund* v. *GAF Corp.*, 766 F. Supp. 384, 386 (W.D. Pa. 1991) (evidence sufficient to show product identification where defendant admitted that it manufactured asbestos-containing gaskets).

b. *Exposure.* Bedford Fruit's fleet consisted of approximately fifteen vehicles, ten of which were medium- to light-duty models. The company purchased parts for their maintenance from eight different stores, including ADAP. Michael Medeiros purchased parts from ADAP "every so often." When ADAP's attorney asked Michael whether he remembered the first and last time he saw the word "asbestos" on parts purchased from ADAP, he responded that "it would be hard for me to say," and explained that he could not "put a finger on one particular place" because "[t]here was so much for so many years."

Brillante stated that brake replacements were a major part of his job. He estimated that he performed that procedure somewhere "in the hundreds" of times at a frequency between every other day to every third day. He did not give an estimate of the frequency of clutch replacements, but described them as "routine" and "many." Michael testified that they did "quite a bit [of clutch work] . . . over the course of time."

Brillante and Michael performed all of the mechanical repair work in the first loading bay of the Bedford Fruit building. Employees called this area "the pit." An elevated runway ran through the middle of the building. The runway was about four feet high and ten feet wide. It separated the half of the building with the loading bays from the half of the building with offices, walk-in coolers, and a storage area.

Anthony Medeiros's office was located directly across the runway from the pit. A door opened from the runway into Anthony's office, and he typically had the door propped open. At the other end of Anthony's office, a door opened into Geraldina's office. In addition, a window connected their offices. They left it open so that they could pass documents back and forth. Geraldina's office was about twenty-five to thirty feet from the pit.

Brillante and Michael used an air hose to blow out the dust as they performed brake and clutch jobs. The air hose would

propel dust into the air. Brillante stated that the bay door to the pit was usually open and that air would flow from the outside across the pit and then into Anthony's office or down the runway.

At deposition, one of the plaintiff's expert witnesses testified that asbestos can "remain airborne for long periods of time, particularly where there is continuing human activity, air currents or other means by which the air is agitated." He testified further that "asbestos fibers can and do drift considerable distances" and that "exposures may occur at ten, 20 or 40 or more feet away from the operation that is actually liberating the asbestos fibers into the air." Another expert added the opinion that "[t]he mechanics' use of an air hose . . . caused asbestos dust to be spread in the ambient air throughout Bedford Fruit's facility," and that Geraldina inhaled this dust "[w]hether in her office or in proximity to the mechanics."

Geraldina worked six days a week. Her usual hours were from seven in the morning to five or six at night. Her activities varied. They included paperwork in her office. She would walk up and down the runway to make sure that the deliveries were going out as planned. She would sometimes inspect produce on the part of the runway adjacent to the pit. She would also run errands taking her in and out of the building up to eight to nine times a day. When she left the building, she would walk across the part of the runway next to the pit, down a set of stairs leading to the pit, and along the side of the pit until she reached a door to the outside.

The volume of parts purchased by Bedford Fruit from ADAP and Geraldina's work routine would permit a finding that she was in "close proximity" to asbestos-containing parts from ADAP on numerous occasions. *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. at 161. Thus, there is sufficient evidence of exposure. See *ibid.* ("It is enough . . . to reach the jury that [the plaintiff] show that [she] worked with, or in close proximity to, the defendants' asbestos products"). See also *Roehling* v. *National Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d at 1228 ("The evidence, circumstantial as it may be, need only establish that [the plaintiff] was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled"). Furthermore, even without close proximity, a jury could infer that Geraldina was exposed to asbestos fibers from ADAP parts which spread into

her office and down the runway from the mechanics' use of the air hose. See *Hoffman* v. *Allied Corp.*, 912 F.2d 1379, 1380, 1383 (11th Cir. 1990) (plaintiff introduced sufficient evidence of exposure, even though he worked more than 300 feet away from dry dock where coworkers used defendant's asbestos products).

c. *Substantial contributing factor.* The plaintiff's expert medical testimony supplies evidence permitting a finding that the exposure to AutoZone's parts substantially contributed to the causation of the mesothelioma.

4. *Plaintiff's case against Orleans.* Similarly, the plaintiff alleges that Geraldina developed mesothelioma by inhalation of asbestos fibers from parts purchased at Orleans.

a. *Product identification.* Orleans has operated an automobile parts store on Barnstable Road in Hyannis since 1978. Bedford Fruit was located within two miles of the store. Michael Medeiros and Brillante purchased aftermarket brake and clutch parts from Orleans for Bedford Fruit's light- and medium-duty vehicles. Michael saw the word "asbestos" written on the packaging of parts from Orleans. At deposition, Orleans's representative admitted that it had sold BorgWarner clutches in the 1970s and 1980s, and that these clutches "likely had some asbestos content." The representative acknowledged that Orleans had sold brake shoes in the 1970s and 1980s which "may have" contained asbestos. He also remembered correspondence from several brake manufacturers indicating that they were removing asbestos from brakes. These communications occurred somewhere between the late 1980s and early 1990s.

The product identification evidence against Orleans closely approximates the evidence against AutoZone. It leads to the same conclusion. Michael's testimony about the packaging of Orleans products is strong evidence that the parts contained asbestos. The admissions of Orleans's representative are similarly probative. The aggregate information would permit a finding that Bedford Fruit personnel purchased asbestos-bearing brake and clutch parts from Orleans.

b. *Exposure.* The exposure evidence against Orleans differs little from the exposure evidence against AutoZone. The evidence of the potential spread of asbestos fibers and Geraldina's prox-

imity to the pit during an average workday is the same. Michael and Brillante's testimony about the volume of purchases at Orleans parallels their testimony about purchases at ADAP. They both testified that Bedford Fruit purchased "a lot" of brakes and other parts from Orleans.

This information, along with Brillante's testimony regarding the regularity of brake and clutch jobs, supports the inference that Bedford Fruit purchased asbestos-containing brake and clutch parts from Orleans on many occasions. The frequency of purchases and the evidence of Geraldina's work routine permitted findings that she had been in "close proximity" to asbestos-containing products from Orleans, and that she had been exposed to asbestos fibers from these products. See *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. at 161. Additionally, the evidence permits a finding that she inhaled asbestos fibers which had migrated from the pit into her office, and which had originated in parts from Orleans. See *Hoffman* v. *Allied Corp.*, 912 F.2d at 1383. Finally, a jury could find the necessary causal link between exposure to products from Orleans and Geraldina's contraction of mesothelioma on the basis of the expert medical opinion.

5. *Plaintiff's case against Great Dane.* The plaintiff alleges also that Geraldina contracted mesothelioma from inhalation of asbestos fibers from the brakes of a Great Dane trailer maintained by Bedford Fruit. The claim rests upon two independent theories of liability. The first is that fibers came from brakes manufactured by Great Dane. The second is that the fibers came from other manufacturers' brakes which Bedford Fruit personnel installed into the Great Dane trailer. In order to succeed under either theory of liability, the plaintiff must present evidence permitting a finding of all the necessary elements of causation. Because the two theories depend on different facts, we analyze them separately.

a. *Great Dane as manufacturer of asbestos-containing brakes.* This theory requires the trailer to have contained asbestos brakes manufactured by Great Dane when Bedford Fruit initially purchased it. Bedford Fruit bought the used Great Dane trailer in 1984. Great Dane had manufactured it in 1977 and originally sold it to one of its independent dealerships. The dealership resold the trailer to the Hertz Corporation. It remained unknown whether Bedford Fruit purchased the trailer from Hertz or a subsequent owner.

Michael estimated that the Great Dane trailer would have needed at least one brake replacement between the time of the original sale in 1977 and the time of its purchase by Bedford Fruit in 1984. He stated that Bedford Fruit personnel changed the brakes on the trailer at least once a year.

At deposition, the Great Dane representative did not know whether the originally manufactured trailer contained asbestos brake linings. However, he admitted that before 1984 Great Dane had manufactured most trailers with asbestos brake linings.

The 1997 Great Dane trailer maintenance manual included an instruction advising mechanics: "When replacing [brake] lining, be sure to use the same lining as that removed from the trailer so that the [gross axle weight rating] is not reduced." The Great Dane representative interpreted this instruction as advice to "replace one friction level lining with the same friction level lining as the replacement lining" and not as advice to "replace asbestos [linings] with asbestos [linings]." He knew that this instruction was a standard directive included in Great Dane maintenance manuals, but he did not know exactly when Great Dane had begun to include the instruction in the manuals.

The plaintiff contends that this evidence permits a finding that the trailer had contained asbestos brakes from Great Dane at the time of its purchase by Bedford Fruit in 1984. Her theory is that a jury could find that Great Dane had manufactured the trailer with asbestos brakes in 1977, and that previous owners had replaced the original asbestos brake linings with more asbestos brake linings from Great Dane by reason of the instruction in the manual.

The admission of Great Dane's representative would allow a finding that Great Dane originally had manufactured the trailer with asbestos brake linings. However, the remainder of Morin's argument involves multiple layers of speculation. First, no evidence indicates that the 1977 trailer maintenance manual contained the same brake replacement instruction as the 1997 manual. Great Dane's representative did not know when Great Dane first inserted this instruction into its trailer maintenance manuals. The evidence is insufficient for the inference that the 1977 manual contained this instruction. Second, even if the jury could infer that the 1977 manual contained this instruction, no evidence indicates that the previous owners would have inter-

preted this instruction in the manner suggested by the plaintiff. Great Dane's representative stated that the instruction was not intended to advise mechanics to replace asbestos brakes with more asbestos brakes. Finally, the instruction did not advise mechanics to replace the brakes only with more brakes from Great Dane. Both Brillante and Michael acknowledged that they had never purchased any replacement parts from Great Dane.

In sum, the plaintiff had no reasonable expectation of proving that the trailer at the time of purchase in 1984 or throughout the period of maintenance to 1991 contained asbestos-bearing brakes manufactured by Great Dane. It could not establish the essential element of product identification.

b. *Failure to warn.* In the alternative, the plaintiff claims that Great Dane is liable for failing to warn Bedford Fruit about the dangers of using compressed air in the removal of any manufacturer's asbestos brakes from the trailer.

Under Massachusetts law, a manufacturer has a duty to warn purchasers of dangers involved in the use of the product of which the manufacturer knows or should know. *Mitchell* v. *Sky Climber, Inc.*, 396 Mass. 629, 631 (1986). Accordingly, a manufacturer has "no duty . . . to set forth . . . a warning of a possible risk created solely by an act of another that would not be associated with a foreseeable use or misuse of the manufacturer's own product." *Id.* at 632. This language leaves unanswered the question whether a manufacturer owes a duty to warn if the potential danger, though created solely by a third party, *is* associated with a foreseeable use of the manufacturer's product.

In the instant case, it was foreseeable to Great Dane that owners might repair its trailers with asbestos brakes from other manufacturers. The plaintiff urges that we impose a duty to warn. No Massachusetts precedent directly addresses that proposition.[10] We need not reach the question, however, as, in the present circumstances, we have a ground for decision short

[10]Courts in several other jurisdictions have confronted the question in asbestos cases. We are aware of three which have held that a manufacturer will not be liable for the risk caused solely by a third party's replacement asbestos product even if the use of the third party's product was reasonably foreseeable to the manufacturer. See *Taylor* v. *Elliott Turbomachinery Co.*, 171 Cal. App. 4th 564, 579 (2009) (no duty to warn of danger created exclusively by a subsequent part from a separate manufacturer); *Ford Motor Co.* v. *Wood*, 119 Md. App. 1, 10, 33-37 (1998) (plaintiff's estate claimed that he contracted

of the proposed choice between adoption or rejection of a cate-
gorical rule or corollary. For the plaintiff to survive Great Dane's
motion for summary judgment, the evidence in the summary
judgment record must create the triable question whether Geral-
dina experienced more than "insignificant or de minimis" exposure
to the asbestos product. *Welch* v. *Keene Corp.*, 31 Mass. App. Ct.
at 162. In contrast to the estimates of the use of voluminous or
substantial amounts of parts from the codefendant retailers,
Michael testified that Bedford Fruit personnel would have
changed the brakes on the Great Dane trailer about once per year.
That process would have occurred on six or seven days over the
ensuing seven-year span, or at a frequency of about once every
300 work days for Geraldina. We do not know whether those
personnel were consistently installing asbestos-bearing brake
linings. The trailer was only one of the fifteen vehicles in the
building bay area or pit. We cannot know whether Geraldina
came into contact with fibers from the trailer's annual brake
replacement. While the standard of proof is generous, it has typi-
cally required evidence of greater exposure than appears from the
Great Dane trailer. See, e.g., *Chavers* v. *General Motors Corp.*,
349 Ark. 550, 563-564 (2002) (affirmance of summary judgment
in favor of defendants; insufficient evidence of exposure to

mesothelioma from exposure to asbestos replacement brakes as he repaired
Ford automobiles; no duty to warn in the absence of conduct by Ford causing
the use of the asbestos parts); *Braaten* v. *Saberhagen Holdings*, 165 Wash. 2d
373, 389-390 (2008), citing *Simonetta* v. *Viad Corp.*, 165 Wash. 2d 341, 363
(2008) (no duty to warn of danger created exclusively by a subsequent part
from a separate manufacturer). Contrast *O'Neil* v. *Crane Co.*, 177 Cal. App. 4th
1019, 1031-1036, cert. granted, 223 P.3d 1 (Cal. 2009) (rejecting the reasoning
in *Taylor* v. *Elliott Turbomachinery Co.*, *supra*, and finding a duty to warn if the
defendant manufacturer reasonably could foresee that its original asbestos parts
would give way to similar asbestos replacement parts, and thus creating a split
of authority among the California intermediate appellate districts).

Considerations against the imposition of a duty to warn about replacement
parts include (1) the original manufacturer's lack of preventive control over
the design and marketing of the later component; (2) its lack of any economic
benefit from the sale of the replacement component; (3) the perishability of
warnings in manuals during the span between the original sale and the later or
remote owner's acquisition of the product; and (4) the greater suitability in
these circumstances of a duty to warn by the component manufacturer by
reason of its control, benefit, and clear accountability. See Riehle, Fox, and
Zand, Products Liability for Third Party Replacement or Connected Parts:
Changing Tides from the West, 44 U.S.F. L. Rev. 33, 61-62 (2009-2010).

asbestos-bearing brakes); *McGonnell* v. *Kaiser Gypsum Co.*, 98 Cal. App. 4th 1098, 1104-1106 (2002) (affirmance of summary judgment in favor of defendants; conjectural evidence of product identification and exposure); *Reiter* v. *Pneumo Abex, LLC*, 417 Md. 57, 73 (2010) (affirmance of summary judgment in favor of defendants; insufficient evidence of proximity and exposure to defendant manufacturers' asbestos-bearing brakes). Compare *Welch* v. *Keene Corp.*, *supra* at 162 (plaintiff described his application of defendants' asbestos-bearing cements on " 'hundreds' of sites"); *Roehling* v. *National Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d at 1226-1227 (through five- to six-month period, plaintiff pipefitter was exposed continuously to asbestos cement in the course of construction of power plant boiler); *In re Hawaii Fed. Asbestos Cases*, 960 F.2d at 818 (plaintiff's estate submitted evidence that he had swept up the dust resulting from the stripping of asbestos insulation from the pipes of at least four major naval ships); *Kreppein* v. *Celotex Corp.*, 969 F.2d at 1425 (plaintiff's estate furnished evidence that for two years he had swept up asbestos debris in the engine rooms and boiler rooms of shipyard vessels and later had suffered additional exposure as an iron worker at three major building sites). Upon the available information related to the Great Dane trailer, we conclude that the evidence requires speculation about a degree of exposure greater than "insignificant or de minimis." The motion judge correctly allowed Great Dane's motion for summary judgment.[11]

*Conclusion.* For these reasons, we reverse so much of the judgment as dismisses the claims against defendants AutoZone and Orleans, and affirm the judgment in all other respects.

*So ordered.*

---

[11]The evidentiary requirement of more than insignificant or de minimis exposure and the characterization of a single inhalation as a substantial contributing factor are not inconsistent. A triable question of liability requires more than a minimal speculative possibility that the victim took a single breath of particles from the product of the charged defendant. The greater the exposure, the greater becomes the probability of an inhalation. Our determination that Geraldina's possible exposure to the Great Dane trailer brake replacement procedure (part of one day per year) leaves any inhalation conjectural. Otherwise, if minimal exposure permitted the inference of an inhalation, the law would effectively subject the defendant manufacturer or seller to the risk of absolute liability.