NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1497                                      Appeals Court

ANN E. PANTAZIS, executrix,[1] vs. MACK TRUCKS, INC., & another.[2]


No. 16-P-1497.

Worcester.     September 12, 2017. - November 27, 2017.

Present:  Milkey, Hanlon, & Shin, JJ.


Negligence, Manufacturer, Duty to warn.  Practice, Civil,
    Summary judgment.


    Civil action commenced in the Superior Court Department on
April 11, 2012.

    The case against defendant Parker-Hannifin Corporation was
heard by Raffi N. Yessayan, J., on a motion for summary
judgment, and entry of judgment was ordered by Shannon Frison,
J.; the case against defendant Mack Trucks, Inc., was heard by
Daniel M. Wrenn, J., on a subsequent motion for summary
judgment, and entry of judgment was ordered by him.


    Roger J. Brunelle for the plaintiff.
    William J. Dailey, III, for Mack Trucks, Inc.
    Richard L. Neumeier for Parker-Hannifin Corporation.


_____

    [1] Of the estate of Mark S. Fidrych.

    [2] Parker-Hannifin Corporation.  Other defendants named in
the amended complaint were dismissed in the trial court and are
not a part of this appeal.

MILKEY, J.  Mark Fidrych owned a dump truck that he used to haul soil.  On the morning of April 13, 2009, Fidrych was seen at his farm working on the truck.  Later that day, he was found dead underneath it, with his clothing caught up in a spinning universal joint (U-joint) that was part of the mechanical system used to tilt the "dump body" of the truck.  The medical examiner identified the cause of death as accidental asphyxiation.  In her capacity as executrix of Fidrych's estate, his widow, Ann Pantazis, filed a wrongful death action in the Superior Court.  She sued, among others, Mack Trucks, Inc. (Mack Trucks), which manufactured the original, stripped-down version of the truck, and Parker-Hannifin Corporation (Parker-Hannifin), which had acquired the assets of Dana Corporation (Dana).[3]  Dana manufactured a piece of equipment known as a "power take-off" (PTO), which was another part of the system used to tilt the dump body of Fidrych's truck.  In two separate summary judgment rulings, different Superior Court judges ruled in favor of each of these defendants.[4]  We affirm.

---

[3] The plaintiff alleges that Parker-Hannifin is derivatively responsible for Dana's liabilities.  For purposes of our analysis, we assume this to be true.

[4] On January 28, 2016, one Superior Court judge allowed Parker-Hannifin's motion for summary judgment, while a different judge subsequently denied its motion for entry of a separate judgment pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974).  On August 4, 2016, yet another judge allowed Mack Truck's motion for summary judgment, and a document entitled "Summary Judgment"

1.  Background.[5]  In 1987, Fidrych purchased the truck from Winnipesaukee Truck P&T, an independent Mack Trucks dealer, which had purchased it from Mack Trucks the previous year.[6]  At the time of Fidrych's purchase, the truck was what is known as an "incomplete vehicle."  That meant that the truck had a chassis, cab, and engine, but it lacked essential components (and associated equipment) necessary to carry out the truck's ultimate intended function.  Through the installation of

---

was issued.  The summary judgment was entered on the docket on August 8, 2016.  Although this "judgment" addressed the plaintiff's claims only against Mack Trucks, it included no references to, or discussion of, rule 54(b).  At that point, the January, 2016, summary judgment ruling involving Parker-Hannifin still had not been reduced to a final judgment.  On October 6, 2016, a second document entitled "summary judgment" issued, this one discussing only the plaintiff's claims against Parker-Hannifin.  This summary judgment was entered on the docket on October 6.  The plaintiff's notice of appeal was filed on October 13, 2016, which was within thirty days of the judgment involving Parker-Hannifin, but more than thirty days after entry of the only identified judgment involving Mack Trucks. Nevertheless, we deem the notice of appeal timely with regard to both judgments, since the first such judgment was not final until the second one entered (and claims involving other defendants were dismissed).  See Jones v. Boykan, 74 Mass. App. Ct. 213, 216-218 (2009).  We repeat our admonition that, unless rule 54(b) is expressly invoked, there should never be more than one document identified as a final judgment in a civil case. Id. at 218 n.9.

[5] In reviewing the allowance of a motion for summary judgment, we examine the evidence in the record de novo, view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of nonmoving party. Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680 (2016), and cases cited.

[6] Strictly speaking, the truck was purchased by, and registered to, Mark Fidrych, Inc.

additional components, incomplete vehicles can be outfitted for a wide variety of uses. For example, an incomplete vehicle can be outfitted for everything from a flatbed truck to a fire truck.

After purchasing the truck as an incomplete vehicle, Fidrych had it transformed into a dump truck. This involved installing a dump body, as well as a mechanical system (auxiliary power system) for tilting that body. The outfitting of the incomplete vehicle occurred decades before the accident, and it is not known who performed that work.

The auxiliary power system used the truck's transmission as the source of its power, employing a series of components that connected the transmission to a hydraulic pump. The transmission that Mack Trucks provided in the incomplete vehicle was designed so that it could be connected to a PTO, and in this case, a PTO manufactured by Dana was added. Once installed, a PTO is a fully enclosed piece of equipment except for a short metal post that extends from the PTO case. The post spins when the PTO is engaged, and the spinning post can be used to power many different types of equipment. In the particular system installed in Fidrych's truck, the PTO was connected to an exposed auxiliary drive shaft, which in turn was connected to a U-joint (also exposed). Finally, the U-joint was connected to a

hydraulic pump that drove the piston that raised and lowered the dump body.

As Fidrych's accident illustrates, having an exposed auxiliary drive shaft and U-joint[7] presents serious potential dangers, e.g., to someone working underneath the truck while the PTO is engaged. It is uncontested that this system could have been designed and installed in a manner that alleviated such risks. For example, as the summary judgment record reveals, the need for the exposed auxiliary drive shaft and U-joint could have been obviated by attaching a hydraulic pump directly to the PTO. In addition, guards could have been installed to shield the moving parts. The plaintiff makes no claim that either of the defendants here had any role in designing or installing the auxiliary power system (beyond designing the individual components that each manufactured and sold).

At the time that Mack Trucks sold the incomplete vehicle and Dana sold the PTO, each manufacturer provided various warnings about risks presented by the future use of a completed vehicle. Specifically, the owner's manual that Mack Trucks provided for the truck included a warning about the use of PTOs and associated equipment. As the plaintiff highlights, the warning was set forth approximately midway through a 112-page

---

[7] It is not clear on the record before us who manufactured the auxiliary drive shaft and U-joint. In any event, there are no claims that Mack Trucks or Dana did so.

manual. Its placement aside, the warning, set off in a box labeled "WARNING" and accompanied by triangles containing exclamation points, stated in bold lettering as follows:

> "Power take-off (P.T.O.) units and their related equipment can be very dangerous. Any P.T.O. installation, repair or replacement should include a warning lamp which indicates P.T.O. engagement. The lamp must be located close to the P.T.O. control and clearly visible.

> "P.T.O. units are driven by the engine or drive train components (flywheel, crankshaft, transmission). No work or service should be performed or attempted on the P.T.O. and related units unless the engine is shut down. Always keep body parts and loose fitting clothing out of the range of these powerful components or serious injury may result.

> "Be sure you are aware of the P.T.O.'s engagement/non-engagement and the position of the truck's body (dump body controlled by P.T.O., etc.). Be sure P.T.O. is disengaged when not in use."

At the time Dana sold the PTO that eventually was installed on the Fidrych truck, Dana provided some general warnings in its owner's manuals about the dangers posed by exposed moving equipment attached to a PTO. Dana also distributed warning stickers meant to be affixed to truck bodies in appropriate places. Those warning stickers stated the following:

"CAUTION

"TO PREVENT POSSIBLE INJURY OR DEATH

"<u>DO NOT</u> GO UNDERNEATH THE VEHICLE WITH THE ENGINE RUNNING.

"<u>DO NOT</u> WORK NEAR A ROTATING DRIVE SHAFT TO PREVENT GETTING CAUGHT OR ENTANGLED.

"<u>DO NOT</u> ATTEMPT TO OPERATE THE CONTROLS OF THE POWER TAKE-OFF OR OTHER DRIVEN EQUIPMENT FROM UNDERNEATH THE VEHICLE WITH THE ENGINE RUNNING.

"<u>DO NOT</u> OPERATE THE CONTROLS OF THE POWER TAKE-OFF OR OTHER DRIVEN EQUIPMENT IN ANY POSITION THAT COULD RESULT IN GETTING CAUGHT IN THE MOVING MACHINERY.

"<u>DO NOT</u> ATTEMPT TO WORK ON AN INSTALLED POWER TAKE-OFF WITH ENGINE RUNNING."

At the same time, the installation instructions that Dana provided stated that "the decisions of whether to install guards and/or warning signs shall be the responsibility of the designers or installers."

Over the ensuing years, both Mack Trucks and Dana sought to make various improvements to the warnings they provided. For example, Mack Trucks made the warning included in its owner's manuals more prominent and added a specific warning about the risk of "death," not just "severe personal injury." For its part, Dana sought to improve its warning stickers, e.g., by adding a pictogram that depicts a human figure entangled in an exposed auxiliary drive shaft. In addition, Dana added a specific warning to its owner's manuals urging that auxiliary drive shafts be eliminated wherever possible and, if not, that the designer or installer add a guard.

2. <u>Discussion</u>. a. <u>The nature of the plaintiff's claims</u>. The plaintiff does not argue that the incomplete vehicle that Mack Trucks sold, or the PTO that Dana sold, contained any

design defect.[8]  Rather, the gravamen of her claims is that the manufacturers had a duty to warn installers and end users about the dangers posed by the use of unguarded auxiliary drive shafts and U-joints, because such future uses were foreseeable.  After all, she argues, the transmission of the truck was designed so that it could accept a PTO, and PTOs could be operated to power an auxiliary drive shaft.  In fact, the plaintiff maintains that the foreseeability of the risks posed by exposed auxiliary drive shafts and U-joints is best demonstrated by the fact that Mack Trucks and Dana each provided some warning about them (warnings that the plaintiff claims ultimately were inadequate).  In the alternative, the plaintiff argues that even if the defendants did not face an independent legal duty to warn about such dangers, they voluntarily assumed such a duty when they provided their warnings about such uses.  We address each of these claims in turn.

b.  <u>The presence of a legal duty</u>.  Both defendants manufactured nondefective components of the equipment whose use

---

[8] It appears that the plaintiff argued in the Superior Court that the PTO should have been designed and sold only with attached guards to shield whatever equipment could be attached to it.  The judge who ruled in Parker-Hannifin's favor on its motion for summary judgment rejected this theory after explaining how impractical he thought it would be for a manufacturer to design guards for the wide variety of equipment that could be attached to a PTO.  As the plaintiff confirmed to us at oral argument, she is no longer pressing this claim on appeal.

caused the harm. As the parties recognize, the key case addressing the extent to which such a defendant has a duty to warn of dangers raised by use of the finished product is Mitchell v. Sky Climber, Inc., 396 Mass. 629 (1986) (Mitchell). In Mitchell, the decedent was electrocuted while he was working on what he thought was a loose connection between electrical power cords of motors used to lift scaffolding. Id. at 630. In fact, the problem was that improper rigging of the scaffolding had cut the insulation of a wire, which then came into contact with an ungrounded junction box that the decedent touched. Ibid. The defendant was the manufacturer of the lift motors that, although having produced only a component of the scaffolding, provided its customers with instruction regarding scaffolding "safety, rigging, operating, and maintenance." Ibid.

In concluding that the defendant had no underlying legal duty to warn of dangers posed by improperly rigged scaffolding, the Supreme Judicial Court endorsed "[t]he prevailing view . . . that a supplier of a component part containing no latent defect has no duty to warn the subsequent assembler or its customers of any danger that may arise after the components are assembled." Id. at 631. The court rejected the plaintiff's argument that the defendant had voluntarily assumed a legal duty by

distributing its manuals.[9]  Id. at 632.  As the court put it, a component part manufacturer has no duty to provide "a warning of a possible risk created solely by an act of another that would not be associated with a foreseeable use or misuse of the manufacturer's own product."  Ibid.  The rule recognized by the court in Mitchell has become known as "the component parts doctrine."  See, e.g., Davis v. Komatsu America Indus. Corp., 42 S.W.3d 34, 38 (Tenn. 2001), citing Murray v. Goodrich Engr. Corp., 30 Mass. App. Ct. 918, 919 (1991) (citing Mitchell for component parts doctrine).

We agree with the motion judges that this case is controlled by Mitchell.  As noted above, whether an auxiliary power system presented the risks at issue here depended on how that system was designed and built.  Put differently, the potential dangers here, as in Mitchell, arose from the assembly of the component parts into the finished auxiliary power system. As the manufacturers of mere components that were not themselves defective, the defendants had no duty to warn assemblers or end users of the risks presented by such systems.  Mitchell, supra at 631.

---

[9] The court separately examined whether the defendant had "voluntarily but negligently made representations in its manual on which [the decedent] or his employer (or others) relied in selecting the parts and assembling the scaffolding equipment." Mitchell, 396 Mass. at 631.  It found nothing in the manual to support such a claim.  Id. at 631-632.

Based on the passage from Mitchell quoted above, the plaintiff argues that the risks here were not created "solely" by the acts of another, and that such risks instead were "associated with a foreseeable use or misuse of" the components that Mack Trucks and Dana provided. Mitchell, supra at 632. According to the plaintiff, the warnings that the defendants in fact provided when their products were sold, as well as the design features of those products, demonstrate that the risks here were foreseeable and, in any event, whether such risks were foreseeable raised a question of fact for a jury.

As an initial matter, we note that whether a tort defendant in a given context owes a legal duty to an injured party generally is treated as an issue of law susceptible to resolution by judges. See Afarian v. Massachusetts Elec. Co., 449 Mass. 257, 261 (2007) ("The existence of a legal duty is a question of law appropriate for resolution by summary judgment"). That is because such questions are resolved "by reference to existing social values and customs and appropriate social policy." Jupin v. Kask, 447 Mass. 141, 143 (2006), quoting from Cremins v. Clancy, 415 Mass. 289, 292 (1993). Thus, a determination of what particular downstream dangers are considered reasonably foreseeable, such that judicial recognition of a legal duty is appropriate, ultimately comes down to "public policy" factors, with the Supreme Judicial Court

serving as the ultimate arbiter of how such factors are to be applied (to the extent that such issues have not been resolved by the Legislature itself).  See Afarian, supra at 261-262.  Contrast Luisi v. Foodmaster Supermkts., Inc., 50 Mass. App. Ct. 575, 577 (2000) (treating "foreseeability" as question of fact for jury in context of analyzing causation, not duty, except for "some instances where a judge may determine that, in the circumstances presented, the harm that befell the plaintiff was not reasonably foreseeable or preventable").

With such considerations in mind, we decline to interpret the language quoted from Mitchell, supra at 632, as creating a broad exception to the component parts doctrine whenever -- as a matter of fact -- there is a dispute on the extent to which the relevant downstream harms could be foreseen.  In other words, we do not view the rule established by Mitchell as turning on the factual unforeseeability of such harms.  Notably, the appeal in Mitchell itself was from summary judgment, and there is no discussion in the opinion about the extent to which the manufacturer of the lift motor in fact appreciated that employees on a scaffolding project could face dangers from improper rigging of the scaffolding (where proper rigging was a subject covered by the manual the manufacturer provided).  Viewing the component parts doctrine in this context, we interpret the court's suggestion that the risks presented there

were not "reasonably foreseeable" not as a conclusion of fact, but as a declaration that such risks would not be deemed "reasonably foreseeable" as a matter of law.  In our view, Mitchell stands for the proposition that, as a general rule, the manufacturer of a nondefective component part has no underlying duty to warn of risks posed by the assembled product that arose out of the addition of other components and the decisions made, and actions taken, by downstream actors.

c.  The voluntary assumption of duty by the defendants.  As in Mitchell, the defendants here did not take on a duty to warn assemblers or end users by their voluntary efforts to warn people of the downstream dangers.[10]  This conclusion is further supported by the Restatement (Third) of Torts:  Products

_____

[10] Like Mitchell, this is not a case where the voluntary warnings that were given could give rise to a claim that the harm was caused by the decedent's reliance on negligent warnings.  For example, nothing in the warnings that Mack Trucks and Dana provided suggests that it was safe for someone to be under a truck with an exposed auxiliary drive shaft while a PTO was engaged.  Nor is this a case where the particular relationship between the decedent and the defendants made it necessary for the defendants to provide the decedent with a complete and comprehensive list of dangers arising out the functioning of their products.  Contrast Cottam v. CVS Pharmacy, 436 Mass. 316, 325 (2002) ("When a pharmacy's communication with a patient concerning a drug is limited to a single label warning of only one side effect, the pharmacy has undertaken a duty to warn correctly as to that specific side effect but has not undertaken a broader duty to warn of all potential side effects. . . .  Where, as here, the patient could reasonably interpret the warning form as a complete and comprehensive list of all known side effects, it is appropriate to impose on the pharmacy a duty commensurate with what it appeared to have undertaken").

Liability § 5 comment d, at 134-135 (1998).  Indeed, in discussing why a manufacturer of a component part has limited duties with respect to risks posed by the assembled end product, the comment to the Restatement uses as an example a manufacturer of truck chasses.[11]

3.  Conclusion.  In sum, we conclude that where, as here, the components manufactured by the defendants included no design defects, and the risks posed by the assembled product arose out of the addition of other components and the decisions made, and actions taken, by downstream actors, the defendants had no duty to warn of those dangers.  Resolving the case as we do, we have no occasion to consider the defendants' other arguments, such as

---

[11] The relevant portion of the Restatement states as follows:

> "Product components include products that can be put to different uses depending on how they are integrated into other products.  For example, the chassis of a truck can be put to a variety of different uses.  A truck chassis may ultimately be used as a cement mixer or a garbage compaction unit or in a flat-bed truck. . . .  A seller ordinarily is not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another utilizes the incomplete product.  A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation.  The same considerations also militate against imposing a duty on the seller of the incomplete product to warn purchasers of the incomplete product, or end-users of the integrated product, of dangers arising from special adaptations of the incomplete product by others."

Restatement (Third) of Torts:  Products Liability § 5 comment d, at 134-135.

their claim that they had no duty to warn of the dangers posed by the exposed auxiliary drive shaft and U-joint in light of the obviousness of such risks, at least to someone with Fidrych's presumed familiarity with the truck that he had owned for over twenty years.  See O'Sullivan v. Shaw, 431 Mass. 201, 203-206 (2000) (recognizing continued viability of open and obvious doctrine in duty to warn cases).

None of this is to say that appellate courts should never recognize exceptions to the component parts doctrine.  In fact, this court recognized the possibility of such an exception in Morin v. AutoZone Northeast, Inc., 79 Mass. App. Ct. 39, 51-52 (2011).[12]  Based on the summary judgment record and the arguments

---

[12] In Morin, the plaintiff (the administratrix of her deceased mother's estate) alleged that the decedent suffered grave injuries as a result of exposure to asbestos contained in brake components used in trucks, including in components used to replace those originally supplied by the manufacturer of the trucks.  79 Mass. App. Ct. at 40-41.  In the relevant passage of that case, we discussed whether a truck manufacturer could be liable based on claims that the manufacturer knew or should have known of the dangers posed by asbestos contained in replacement components manufactured by others.  Id. at 51.  As the defendants highlight, the court did not ultimately resolve whether the truck manufacturer had a legal duty to warn of such risks, because it ruled in the truck manufacturer's favor on other grounds.  Id. at 51-52.  The statements on such issues therefore constitute dicta.  In addition, we note that in Morin, the manufacturer knew that the brake components that it itself supplied would need to be replaced, id. at 51, and the particular role it played with respect to such components is at least somewhat different than that presented in the case before us.  Finally, it bears noting that Morin arose in the context of asbestos exposure, a substantive area in which, to some extent, special liability rules have developed.  See id. at 42-43

raised, the plaintiff has not demonstrated good cause to create an exception here.[13]

Judgments affirmed.

---

(noting that "[s]everal characteristics of the generation of disease and death by asbestos inhalation have moved courts to adapt the standard of proof of causation").

[13] The plaintiff argues that "[a]bsolving Mack Trucks and [Dana] of any legal responsibility to warn about the dangers of auxiliary drive shafts connected to and actuated by their products would allow this extremely dangerous machinery to be released into the stream of commerce without any warnings about those dangers." This argument is unconvincing. Whoever designed and assembled the auxiliary drive system might well have faced a duty to warn future truck users of the dangers that system posed (e.g., by installing the warning stickers that Dana provided). That such parties could not, in fact, be identified here does not provide a valid reason for rendering upstream component parts manufacturers liable.